Michelle R. Matheson #019568
Darrel S. Jackson # 018415
Matthew E. Walls # 026523
MATHESON & MATHESON, P.L.C.
15300 N. 90th Street, Suite 550
Scottsdale, Arizona 85260
(480) 889-8951
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Timothy Blotzer; and Fred Lilly;<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>L-3 Communications Corporation, a foreign corporation;<br><br>　　　　　Defendant. | No.: CV 11-274 TUC-JGZ<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>-AND-<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT** |

This memorandum is supported by Plaintiffs' Response to Defendant's Statement of Facts ("**PR-DSOF**"), filed separately.[1]

**I.   As a matter of law, Plaintiffs were not exempt under the FLSA.**

Because the FLSA "is to be liberally construed to apply to the furthest reaches consistent with Congressional direction . . . FLSA exemptions are to be narrowly construed against . . . employers and are to be withheld except as to persons plainly and unmistakably within their terms and spirit." Klem v. County of Santa Clara, 208 F.3d 1085, 1089 (9th Cir. 2000) (internal quotation marks and citations omitted). The employer always has the burden of proving that an FLSA overtime exemption applies to

---

[1] This memorandum refers to "Defendant's Statement of Facts in Support of Motion for Summary Judgment and Response to Plaintiffs' Statement of Facts" (Dkt. 71) as "**DSOF**," and refers to "Statement of Material Facts In Support of Plaintiffs' Motion For Partial Summary Judgment" (Dkt. 68-2) as "**PSOF**."

-1-

its employee. Christopher v. SmithKline Beecham, Corp., 635 F.3d 383, 391 (9th Cir. 2011). To meet its burden, an employer must establish that the employee satisfies *each* of the criteria set forth in the Secretary of Labor's regulations. See Bratt v. County of Los Angeles, 912 F.2d 1066, 1069-70 (9th Cir. 1990) (affirming summary judgment for plaintiff where employer had failed to raise genuine dispute regarding one criteria of the administrative exemption). "The criteria provided by regulations are absolute and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the Act." Id. (quoting Mitchell v. Williams, 420 F.2d 67, 69 (8th Cir. 1969)).

### A. Administrative Exemption

**1. The record does not raise a genuine dispute regarding whether Plaintiffs' primary job duty was directly related to L-3's "management or general business operations."**

L-3 improperly cites to a federal regulation that was rescinded in 2004 (29 C.F.R. § 541.205) to support its argument that Plaintiffs' primary job duty was related to L-3's management or general business operations (and its quotation of the old regulation is inaccurate). (Dkt. 70, p. 10)[2] Thus, L-3 applies an incorrect standard to this issue.

In FLSA cases, a court must first determine the employee's primary duty, and then determine whether that primary duty exempts the employee from any group that might enjoy the FLSA's protections. See, e.g., Maestas v. Day & Zimmerman, LLC, 664 F.3d 822, 827 (10th Cir. 2012). Here, L-3 acknowledges that the Plaintiffs' "primary job duty was to inspect construction work as it was completed on the Project," that "[m]ost of Blotzer's and Lilly's time at work was consumed by performing inspections of completed work," and that the Plaintiffs "were usually in the field at a construction site, inspecting work and completing paperwork related to their inspections." (PSOF ¶¶ 4, 8; DSOF ¶¶

---

[2] L-3's memorandum (Dkt. 70) does not conform to Local Rule 7.1(b)(1) because the left margins are one-inch, rather than 1 ½ inches. The additional space adds approximately two extra pages to a 30-page brief.

47, 51)  This inspection work was part of the construction services that L-3 provided to its customer, Boeing.  (DSOF ¶¶ 2, 3, and 4)  Thus, Blotzer's and Lilly's primary job duty was analogous to production work, as opposed to running the L-3 corporation itself. Consequently, plaintiffs' primary job duty was not directly related to L-3's management or general business operations.  29 C.F.R. § 541.200(a)(3); *see* Giannini v. Standard Oil Co., 130 F.Supp. 740, 747 (N.D. Ind. 1955) (holding that inspecting construction and maintenance work was not related to management or general business operations). For this reason alone, the Plaintiffs fall outside of the administrative exemption.

L-3 incorrectly asserts that certain tasks that Plaintiffs performed were directly related to L-3's management or general business operations.  For example, L-3 asserts (without citation to the record) that Plaintiffs' interactions with L-3's customers (*i.e.*, Boeing and government inspectors) helped to create a "collegial and collaborative environment."  (Dkt. 70, p. 11)  L-3 further asserts that Plaintiffs "were responsible for interfacing with and selling L-3's work product to L-3's customer, Boeing."  (DSOF ¶ 14)  Even if we assume that these assertions are true, they do not bring the Plaintiffs' job duties within L-3's management or general business operations.  If they did, then every retail sales representative, every waiter in a restaurant, and every grocery store cashier could be deemed administratively exempt from overtime.

In Martin v. Cooper Elec. Supply Co., 940 F.2d 896 (3d Cir. 1991), the employer made an argument that was similar to L-3's argument here, and it failed.  The employer argued that inside sales representatives were exempt under the administrative exemption because they "represented" the company to customers and "negotiated" with customers to make sales.  Id. at 904.  The Martin court rejected that argument, reasoning that those activities were part of engaging in the employer's business, as opposed to servicing the business itself.  Id. at 904-05.  Similarly, the Plaintiffs' interactions with L-3's customers (as alleged by L-3) were part of the the "product" that L-3 was selling to its customer, and not related to L-3's overall management or general business operations.

L-3 also asserts that Plaintiffs' inspection work was related to "L-3's operations and management" because "Plaintiffs' inspections and their completion of the related paperwork . . . ensured safety, workmanship, consistency, timeliness, and quality assurance on the project."[3] (Dkt. 70, p. 10-11)  However, L-3 fails to explain why this list of positive outcomes is somehow related to L-3's management and general business operations.  Indeed, L-3's assertion expressly provides that those positive outcomes were "on the project," and therefore not related to the management and general business operations of L-3 itself.

L-3 further asserts that Plaintiffs' primary job duties were somehow directly related to L-3's management or general business operations because "Plaintiffs' authority to red-line minor discrepancies and escalate others to management and engineering was instrumental to L-3's completion of the project."  (Dkt. 70, p. 11)  Although the parties dispute whether the Plaintiffs could in fact make any "red-line" changes to the controlling documents on their own authority (*see* **PR-DSOF** at ¶ 19), L-3 again fails to explain how these duties (even assuming they took place as L-3 alleges) were directly related to L-3's management or general business operations.  Indeed, L-3 specifically asserts that these tasks were instrumental to completion "of the project," thereby suggesting that they were related to the product that L-3 was selling to its customer as opposed to the running of L-3 itself.

L-3 further contends that Plaintiffs' primary job duty was directly related to L-3's management and general business operations because they provided "feedback to their supervisors with respect to the development and continuous evolution of L-3's quality documents." (Dkt. 70, p. 11)  Blotzer and Lilly acknowledge that they periodically gave

---

[3] L-3 does not cite to the record to support each part of that contention, and parts of that contention are inconsistent with the record.  For example, the record reflects that Plaintiffs' inspections resulted in delays, because any non-conformity revealed during an inspection had to be corrected by L-3's engineering and operations personnel. (PSOF ¶¶ 15, 16, 21)

their supervisors feedback about the documents that controlled their inspection work, *i.e.*, WOPs and QCCs. (PR-DSOF ¶¶22-25) However, once again, L-3 provides no analysis or authority to explain why this feedback was directly related to L-3's management or general business operations. To the contrary, that feedback was directly related to how Plaintiffs were to carry out their work on the project, so it was directly related to L-3's provision of construction services to its customer, as opposed to the running of L-3 itself.

Moreover, the record is clear that the Plaintiffs spent only a small amount of their time providing feedback to their supervisors regarding the various documents that controlled their inspection activities. (PR-DSOF ¶¶ 20-25) Because the Plaintiffs undisputedly spent most of their time in the field conducting inspections of completed work (PSOF ¶¶ 4, 8; DSOF ¶¶ 47, 51), but only periodically provided feedback to their supervisors, the Plaintiffs' feedback was not their primary duty. *See* 29 C.F.R. § 541.700(b) ("The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.")

Lastly, L-3 flatly asserts (without citation to the record or explanation) that "Plaintiffs performed more difficult and complex tasks" and that that fact somehow "requires that their primary job duty be considered operations/management related." (Dkt. 70, p. 12) However, L-3's assertion relies on a regulation that was rescinded in 2004 (29 C.F.R. § 541.103). Further, the single case on which L-3 relies, <u>Smith v. First Union Nat'l Bank</u>, 202 F.3d 234 (4th Cir. 2000), is materially distinct. In <u>Smith</u>, the court held that the plaintiff fell within the FLSA's <u>executive exemption</u> (applying the "short test" that is no longer in effect) because she helped to manage a team of 16 claims adjustors. <u>Id</u>. at 250-52. Notably, the case does not discuss whether the plaintiff met the administrative exemption or whether the plaintiff's job duties were directly related to the "management or general business operations" of the employer, which is the proposition that L-3 claims it establishes.

L-3 attempts to analogize this case to several other "administrative exemption" cases. (Dkt. 70, pp. 13-17) The Plaintiffs discussed many of these cases in its opening brief and refer the Court to that analysis. (Dkt. 68-1, pp. 12-15) However, L-3's discussion of an additional case, Copas v. East Bay Mun. Dist., 61 F.Supp.2d 1017 (N.D. Cal. 1999), warrants reply because the contrast between Copas and this case underscores the fact that Plaintiffs' primary job duty was not related to L-3's management or general business operations. In Copas, one of the plaintiffs, Bruce Lepore, served as the Occupational Health and Safety Administrator for a public utility that provided water and water treatment services. Id. at 1018, 1039. The court held that Lepore fell within the administrative exemption, noting that his duties were directly related to the utility's general business operations. Id. at 1041. As evidence, the court noted a long list of Lepore's duties, including:

- Coordinating and implementing the utility's occupational health and safety program and workers' compensation program;
- Coordinating and monitoring the utility's accident prevention program;
- Drafting budgets and making budget recommendations;
- Coordinating the utility's Employee Assistance Program;
- Recommending settlements in workers' compensation cases, with some authority to enter into such settlements on the utility's behalf;
- Locating, and entering into contracts with, outside vendors; and
- Investigating accidents, analyzing the causes of accidents, and implementing measures to prevent the recurrence of accidents.

Id. at 1039-40.

Given that list of duties, it is not surprising that the court in Combs concluded that Lepore fell within the administrative exemption. Lepore not was engaged in providing water or water treatment to the utility's customers, but rather was engaged in servicing the utility itself, or its "general business operations." Id. at 1041 ("The evidence shows that Lepore's primary duties involved the performance of nonmanual work directly related to the District's general business operations."). In contrast, Plaintiffs' duties were on L-3's customer-facing production side.

L-3 has identified no evidence in the record supporting its argument that Plaintiffs' primary job duty was directly related to L-3's management or general business operations, as required by 29 C.F.R. § 541.200(a)(2). Absent such evidence, this court must conclude as a matter of law that Plaintiffs did not qualify for the administrative exemption under the FLSA. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

**2. L-3 has not raised a genuine dispute regarding whether Plaintiffs' "primary job duty included the exercise of discretion and independent judgment with respect to matters of significance."**

L-3 again relies on a federal regulation that was rescinded in 2004 (29 C.F.R. § 541.207) to support its argument that Plaintiffs' primary job duty included the exercise of discretion and independent judgment with regard to matters of significance. (Dkt. 70, p. 12) Accordingly, its legal arguments on this issue are equally flawed. For example, L-3 asserts that "discretion and independent judgment" merely means that the employee had "reasonable latitude" in carrying out his duties. (Id., citing to 29 C.F.R. § 541.207(d)(2)) However, that regulation no longer exists and, notably, the quoted phrase was not incorporated elsewhere in the regulations implementing the FLSA.

In any case, L-3 admits that Plaintiffs' "primary job duty was to inspect construction work as it was completed on the Project"; that "[m]ost of Blotzer's and Lilly's time at work was consumed by performing inspections of completed work"; and that the Plaintiffs "were usually in the field at a construction site, inspecting work and completing paperwork related to their inspections." (PSOF ¶¶ 4, 8; DSOF ¶¶ 47, 51) L-3 also admits that the purpose of Plaintiffs' inspections was to "verify whether the work had been completed in strict adherence to the applicable specifications." (DSOF ¶ 47) Thus, the Plaintiffs' primary job duty of inspecting completed work did not allow for the exercise of discretion and independent judgment, because the Plaintiffs' decisions to approve or reject completed work were controlled by the applicable specifications. *See* 29 C.F.R. § 541.203(g) ("Ordinary inspection work generally does not meet the duties requirements for the administrative exemption."); McComb v. Robert W. Hunt Co., 172

-7-

F.2d 751, 754 (7th Cir. 1949) (affirming district court's conclusion that inspectors did not exercise discretion and independent judgment because "[t]hey went out on the job armed with their credentials and other instructions and data to guide them"); Giannini v. Standard Oil Co., 130 F.Supp. 740, 746 (N.D. Ind. 1955) (holding that inspectors did not exercise discretion and independent judgment where their inspections were "guided by form sheets, blueprints, tables, diagrams and other predetermined standards").

L-3 points to several examples where the Plaintiffs allegedly exercised discretion and independent judgment (Dkt. 70, p. 13). However, even assuming for the sake of argument that L-3's examples do identify instances where Plaintiffs exercised discretion and independent judgment, L-3 has failed to explain why any of its examples relate to "matters of significance," as is also required under 29 C.F.R. 540.200(a)(3).

The FLSA's implementing regulations explain that the term "matters of significance" relates to "the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). The court may consider many factors in determining whether a particular job duty relates to a matter of significance. Id. at 541.202(b). Unfortunately, there is scant case law applying this regulation. However, in Combs v. Skyriver Commc'ns, Inc., 159 Cal.App.4th 1242 (2008), the California Court of Appeal applied the regulation and held that the employee's exercise of discretion and independent judgment related to matters of significance because he "was responsible for maintaining, developing and improving [the employer's information technology] network, and his duties involved high-level problem solving, preparing reports for [the employer's] board of directors, capacity and expansion planning, planning for the integration of acquired networks into [the employer's] network, lease negotiations, and equipment sourcing and purchasing." Id. at 1264. Clearly, the "matters of significance" in Combs were matters that impacted the employer's entire operation at a high level.

In contrast, L-3's examples are merely routine tasks related to Plaintiffs' inspection work, and were not "significant." For example, L-3 contends that Plaintiffs

-8-

exercised discretion and independent judgment with regard to matters of significance when they decided "whether to draft an NCR." (Dkt. 70, p. 13). In fact, Plaintiffs exercised no discretion when they decided to draft an NCR, because their inspections were tightly controlled by the applicable specifications and completing an NCR form was the prescribed method for documenting non-conforming work. (PSOF ¶¶ 4, 15) In any case, on the record before it, this court cannot reasonably conclude that Plaintiff's inspection work on this project impacted the L-3 corporation in any broad or high-level way, as in <u>Combs</u>, when Plaintiffs determined that some discrete task on the Project did not conform. L-3's failure to identify any record evidence supporting its argument that Plaintiffs' exercised discretion and independent judgment with respect to "matters of significance" precludes a dispositive ruling on Defendant's behalf and, instead, Plaintiffs are entitled to a ruling in their favor that they did not qualify for the administrative exemption under the FLSA.

### B. Executive Exemption and Combination Exemption

#### 1. Plaintiffs did not meet any of the executive exemption's requirements, apart from the salary requirement.

The record shows that Plaintiffs did not "customarily and regularly" direct the work of "two or more other employees," as required by 29 C.F.R. § 541.100(a)(3). L-3 admits that construction work on the Project was managed by L-3's Operations department, and that Plaintiffs did not make decisions, or changes to the Project, with regard to what to build, where to build, or when to build. (PSOF ¶ 19; DSOF ¶ 62) Indeed, Robert Redd's deposition testimony makes it clear that Blotzer and Lilly did not direct the work of L-3's Operation department employees: "And there were two sides of the house. Mine was on the operations side and [Blotzer] and [Lilly] were on, they were on the quality control side. . . . It was my responsibility to build it and it was their responsibility to make sure it was built per spec." (PR-DSOF ¶ 30)

Nevertheless, L-3 argues Plaintiffs that Plaintiffs somehow "directed the performance of entire L-3's operations staff [sic]" merely because Plaintiffs inspected the Operation department's completed work. (Dkt. 70, p. 19)  In other words, L-3 is claiming that inspecting completed work as part of a quality control function is tantamount to directing the work of the Operations employees who actually did the construction, <u>even though those employees were in a different department with their own manager</u>. This argument is a thinly veiled attempt to shoehorn the Plaintiffs into an FLSA exemption that plainly does not apply.

Plaintiffs also did not meet the "hiring and firing" requirement set forth in 29 C.F.R. § 541.100(a)(4). L-3 does not dispute that the Plaintiffs did not hire or fire other employees. (DSOF ¶ 61) Moreover, there is no evidence in the record that Blotzer ever gave any suggestions or recommendations to L-3 "as to the hiring, firing, advancement, promotion or any other change of status of other employees" or that L-3 would have given any such recommendations "particular weight." 29 C.F.R. § 541.100(a)(4). The closest that L-3 can come to meeting this requirement is to point out that, as part of his inspection duties, Blotzer <u>once</u> noted in an NCR that the work had been done in a "shoddy" way. (DSOF ¶ 61) However, there no evidence in record that (i) Blotzer identified the responsible employee or recommended any change of status for the employee; (ii) L-3 viewed Blotzer's notation as a recommendation to change the employee's status or that L-3 even saw the notation; or (iii) that L-3 actually changed the employee's status as a result.

With regard to Lilly, L-3 correctly asserts that he recommended to L-3 that it hire Blotzer and that L-3 relied on that recommendation. (DSOF ¶ 61) However, the record holds no other evidence that Lilly made any other recommendation to L-3 regarding any change in status for any other employee. Lilly's single recommendation to hire Blotzer does not bring him within the regulation because the plain language of the regulation clearly requires "suggestions or recommendations" (plural) and Lilly made only one such

recommendation. This distinction is not frivolous given that "FLSA exemptions are to be narrowly construed against . . . employers and are to be withheld except as to persons plainly and unmistakably within their terms and spirit." Klem, 208 F.3d at 1089. Indeed, it would run counter to the FLSA's remedial purpose to conclude that an employee could risk losing his entitlement to overtime merely because he made single hiring recommendation to his employer.

Finally, L-3 does not cite to record or explain how Plaintiffs' primary job duty somehow constituted management of L-3's enterprise or a customarily recognized department or subdivision thereof, as required under 29 C.F.R. § 541.100(a)(2). (Dkt. 70, pp. 18-19) Indeed, it is undisputed that Blotzer and Lilly spent most of their time in the field conducting inspections of completed work (PSOF ¶¶ 4, 8; DSOF ¶¶ 47, 51), so it would strain reason to conclude that they also had time to manage L-3's enterprise or a department of subdivision thereof.

**2. Plaintiffs did not qualify for the combination exemption under 29 C.F.R. § 541.708.**

L-3 acknowledges that the Plaintiffs' "primary job duty was to inspect construction work as it was completed on the Project"; that "[m]ost of Blotzer's and Lilly's time at work was consumed by performing inspections of completed work"; and that the Plaintiffs "were usually in the field at a construction site, inspecting work and completing paperwork related to their inspections." (PSOF ¶¶ 4, 8; DSOF ¶¶ 47, 51) Thus, the Plaintiffs primary job duty could not possibly be a combination of managing L-3's enterprise or a department thereof and work directly related to L-3's management or general business operations, as required under 29 C.F.R. § 541.708.

**II.    L-3's Affirmative Defenses**

L-3 insists that it properly pled its affirmative defenses in its Answer. (Dkt. 70, p. 29) Plaintiffs agree, and have never alleged otherwise. Rather, the issue with L-3's affirmative defenses is that L-3's responses to Plaintiffs' contention interrogatories failed

-11-

to identify any material facts or persons with relevant knowledge regarding their affirmative defenses. Therefore, pursuant to Rule 37(c), L-3 should not be permitted to use, either for dispositive motion or at trial, evidence that it failed to timely disclose as required under Rule 26. (*See* Dkt. 68-1, pp. 23-25)

Plaintiffs acknowledge that L-3's counsel advised in a May 25, 2012 letter that L-3 would withdraw, *without prejudice*, affirmative defenses B, G, H, K, L, and M.[4] It now appears that L-3 has withdrawn those affirmative defenses *with prejudice*. (*See* Dkt. 70, p. 30 ("[T]here is no genuine issue of material fact with respect to affirmative defenses B, K, G, H, L, and M as L-3 is not pursuing these affirmative defenses."))

L-3 also seems to have abandoned three of its remaining affirmative defenses. Specifically, L-3 offered neither argument nor citations to the record in support of affirmative defenses C (Section 10 Good Faith), I (Estoppel), and J (Laches). (*See* Dkt. 10, Answer) Consequently, L-3 cannot meet its burden of proof and all three defenses should fail as a matter of law.

With regard to its Section 11 good-faith defense to liquidated damages, L-3 insists that it complied with its disclosure obligations under Rule 26. (Dkt. 70, pp. 27-29) First, L-3 argues that its Answer properly raised the defense. However, the Answer says nothing about what L-3 knew, believed, or did at the time it classified Blotzer and Lilly as exempt. (Dkt. 10, Affirmative Defense E) Similarly, L-3 asserts that it "explained its basis" for the pleading the defense in its Joint Case Management Report, but (like the Answer) that document does nothing more than raise the defense. (Dkt. 15, p. 7) It does not reveal the material facts and persons with relevant information related to the defense, as Plaintiffs' requested in their contention interrogatory.

---

[4] L-3's offer came 37 days after the close of discovery, which was April 18, 2012. (*See* Dkt. 58) By that time, Plaintiffs' counsel had completed Plaintiffs' summary judgment motion and statement of facts. Indeed, when L-3's letter arrived, Plaintiffs' counsel was putting the finishing touches on those pleadings, which were filed later that same day.

L-3 also asserts that its "position on this issue" was set forth in a December 12, 2011 letter from L-3's counsel to Plaintiffs' counsel, but this assertion is also false.[5] In the opening paragraph, L-3's counsel explained that the letter presents "an explanation of L-3's position on the following issues: (1) impropriety of claims for unreported time; and (2) use of fluctuating workweek for calculation of damages in misclassification matters." The letter discusses those two issues at considerable length. However, it provides absolutely no information that might be relevant to L-3's Section 11 good-faith defense to liquidated damages. In short, the letter says nothing about the "who, when, where, why, or how" related to L-3's decision to classify Blotzer and Lilly as exempt.

Thus, notwithstanding its representations to the contrary, L-3 never disclosed the material facts and persons with relevant knowledge concerning its good faith affirmative defense to liquidated damages. L-3 attempts to avoid a Rule 37(c) sanction by arguing that it "was justified in objecting to Plaintiffs' interrogatories for several reasons," but it provides no explanation, argument, or legal authority to support this position. (Dkt. 70, p. 28) L-3 also asserts that any failure to disclose was harmless and substantially justified but, again, L-3 fails to explain or support this assertion. Accordingly, this Court should enforce Rule 37(c)(1) by concluding that L-3 may not use any evidence on this issue, either on dispositive motion or at trial, that it failed to disclose.

Even without such a ruling, Plaintiffs are entitled to summary judgment on this issue because there is <u>no evidence in the record</u> to establish that L-3 acted in good faith when it decided to classify Blotzer and Lilly as exempt. For example, the record contains no evidence at all regarding (1) when L-3 decided to classify Blotzer and Lilly as exempt,

---

[5] The Index to L-3's Statement of Facts suggests that L-3 intended to include a copy of the letter as an exhibit at Tab 7, but the letter was not included in L-3's filing. (Dkt. 71) Consequently, Plaintiffs have provided a copy of the letter as Exhibit A to this memorandum. Because the letter was sent as a "FRE 408 Communication," Plaintiffs have redacted any specific references to settlement in the letter, so that only the portions to which L-3 refers in its briefing are before the court.

-13-

(2) who was involved in that decision, (3) what experts or other resources may have been consulted, (4) what the decision-makers understood or believed about the nature of Blotzer's and Lilly's job duties, or (5) whether L-3 created a written record of their decision-making process. Defendant points to "the body of case law and supporting regulations" presented in L-3's briefing in this lawsuit as evidence that it acted in good faith. (*See* Dkt. 70, p. 28) However, there is no evidence in the record establishing that anyone at L-3 reviewed or considered any of that information when L-3 classified Blotzer and Lilly as exempt. *See* Rainey v. Am. Forest & Paper Ass'n, Inc., 26 F.Supp.2d 82, 98-99 (D.D.C. 1998) (holding that Defendant failed to establish good faith defense to liquidated damages because it presented no evidence regarding its efforts, "at the time" it classified plaintiff as exempt, to ascertain the FLSA's requirements). Thus, L-3 cannot meet its burden of proving that it acted with subjective good faith (*i.e.* an honest intention to ascertain and follow the FLSA's dictates) and had objectively reasonable grounds (*i.e.*, that it relied on a reasonable, albeit erroneous interpretation of the FLSA and accompanying regulations). *See* Marshall v. Brunner, 668 F.2d 748, 753 (3d Cir. 1982) (defining subjective good faith); Bratt, 912 F.2d at 1072 (defining reasonable grounds).

### III.   Fluctuating Workweek (FWW) Method[6]

L-3 argues that the FWW method should be used to calculate overtime damages retroactively in misclassification cases, provided only that the employer and employee had a "clear mutual understanding" that the employee's "fixed salary would be compensation for all hours actually worked, rather than a fixed number of hours per week." (Dkt. 70, pp. 23-24, citing W&H Op. Let. FLSA-773 (Feb. 26, 1973)) Here, it is undisputed that, beginning in February 2011, L-3 paid the Plaintiffs straight-time pay, in addition to the Plaintiffs' bi-weekly salary, for hours worked between 50 and 60 each week. (PSOF ¶ 26; DSOF ¶ 69) Thus, L-3 and the Plaintiffs could not possibly have had

---

[6] Plaintiffs rely on their opening brief with regard to whether the FWW method should be applied retroactively to calculate overtime damages in a misclassification case.

a clear mutual understanding that Plaintiffs' bi-weekly salary was intended to be their sole compensation regardless of how many hours they worked, because any such understanding would have been inconsistent with the undisputed reality.

In an attempt to cover this obvious hole in its case, L-3 asserts that the parties' clear mutual understanding need only exist at "the inception" of employment. (Dkt. 70, p. 26)  However, the two cases on which L-3 relies for that contention do not speak to that issue at all.  Indeed, in both cases, the employees were paid a fixed salary and received no additional compensation, unlike Blotzer and Lilly.  <u>Desmond v. PNGI Charles Town Gaming, LLC</u>, 630 F.3d 351, 353-54 (explaining that the employees received "a fixed weekly salary that the parties intended to cover all hours worked."); <u>Urnikis-Negro v. Am. Family Prop. Servs.</u>, 616 F.3d 665, 666 (7th Cir. 2010) ("Urnikis-Negro was never paid anything above her fixed salary for her overtime hours.")  Thus, neither case dealt with a situation where the employee received a fixed salary plus compensation for some hours worked over 40, as is the case here.  More importantly, neither case held that the parties' clear mutual understanding need only exist at the inception of employment; indeed, neither case even considered the issue.  These same flaws also apply to the DOL opinion letter on which L-3 relies (DOL W&H Op. Let. FLSA 2009-3).

For the foregoing reasons, Plaintiffs request that the Court grant their motion for partial summary judgment and deny L-3's motion for summary judgment.

                RESPECTFULLY SUBMITTTED this 9th day of July, 2012.

                            MATHESON & MATHESON, P.L.C.

                            /s/ Darrel S. Jackson
                            By:  Darrel S. Jackson # 018415

**CERTIFICATE OF SERVICE**

I hereby certify that, on **July 9, 2012**, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants, and hand delivered a copy of the attached document to:

Laurent R.G. Badoux (No. 020753)
Juliet S. Burgess (No. 023475)
LITTLER MENDELSON
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road, Suite 900
Phoenix, AZ 85016.4242
Attorneys for Defendant


/s/ Darrel S. Jackson