**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Timothy Blotzer and Fred Lilly, | No. CV-11-274-TUC-JGZ |
| Plaintiffs, | **ORDER** |
| vs. | |
| L-3 Communications Corp., | |
| Defendant. | |

Pending before the Court is Plaintiffs' Motion for Partial Summary Judgment filed on May 25, 2012.  (Doc. 68.)  Defendant filed a cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Partial Summary Judgment on June 28, 2012.[1] (Doc. 70.)  Plaintiffs filed a Response/Reply on July 9, 2012 and Defendant filed a Response/Reply on July 24, 2012.  (Docs. 72, 74.)  For the reasons stated herein, the Court will grant the Plaintiffs' Partial Motion for Summary Judgment and deny the Defendant's Motion.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

---

[1] Pursuant to the Court's May 15, 2012 Order, the parties followed an abbreviated briefing schedule on their cross-motions and were granted leave to exceed page limitations. (Doc. 67.)

[2] The Court finds this matter suitable for decision without oral argument.  See *Mahon v. Credit Bureau of Placer County, Inc*., 171 F.3d 1197, 1200 (9th Cir. 1999) (explaining that if the parties provided the district court with complete memorandum of law and evidence in support of their positions, ordinarily oral argument would not be required).

In 2009 and 2010, Defendant L-3 Communications Corporation ("L-3") was a contractor performing construction work on a "SBI Net" project in southern Arizona for the United States Department of Homeland Security ("the Project"). (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)   The SBI Net system is a series of towers that host detection and communication equipment used to monitor persons entering into the United States from Mexico along the Arizona border. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)  The equipment on the towers sends video and data to a command and control building, called the "C-2 Building." (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)  Boeing was the primary contractor on the Project and it hired L-3 to perform and manage construction work on the Project. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)  The construction work on the Project was managed by L-3's Operations Department. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)   Employees within the Operations Department completed some of the construction work themselves, while other construction work was performed by various subcontractors that L-3 retained and managed through its Operations Department. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)  While the Operations Department was responsible for completing construction work, L-3's Quality Control Department ("QC") was responsible for checking the completed work to make sure that it complied with applicable specifications. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)

Plaintiff Fred Lilly began working for L-3 on August 10, 2009 and Plaintiff Timothy Blotzer began working for L-3 on October 5, 2009. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)  Plaintiffs worked for L-3 as QC Field Inspectors within the QC department. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)  Neither Plaintiff has a college degree; a college education was not required for the position. (Doc. 68-2, pg. 3; Doc. 71, pg. 12.)  The compensation associated with the QC Field Inspector position is less than $100,000 annually. (Doc. 68-2, pg. 3; Doc. 71, pg. 12.)  Plaintiffs' primary job duty was to inspect construction work as it was completed on the Project to verify whether the work had been completed in strict adherence to the applicable specifications. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)   To this end, Plaintiffs' primary job duties involved comparing the engineering plans and specifications with the specific work being inspected in order to identify

- 2 -

discrepancies and ensure that there was proper workmanship and compliance with the operative grounding and electrical manuals (*ie.* the Motorola R-56 and the National Electrical Code) as well as the company's internal Work Order Process ("WOPs"), which detailed in a step-by-step fashion how a particular task was to be completed. (Doc. 71, pg. 2; Doc. 73, pg. 2.) Plaintiffs contend that their inspections were assigned by their supervisors; according to Defendants, Plaintiffs inspected the items as construction dictated, in adherence with the Buildbook and as they saw fit in their own judgment. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.) Plaintiffs initially reported to Doug Gordon; in January 2010 they began reporting to Jeff D'Heron. (Doc. 68-2, pg. 2; Doc. 71, pg. 12.)

The parties dispute the nature of Plaintiffs' work. Plaintiffs contend that they regularly performed manual labor and that they completed additional paperwork and received instructions from their supervisor at the beginning and end of each workday. (Doc. 68-2, pgs. 3-4.) Defendant contends that Plaintiffs completed paperwork throughout the day and were self-directed in their inspections. (Doc. 71, pg. 13.) The parties disagree as to the amount of discretion and authority Plaintiffs had in conducting inspections. (Doc. 68-2, pgs 4-6; Doc. 71, pgs. 13-16.) The parties agree that Plaintiffs spent most of their workday, including the time spent completing paperwork, in the field. (Doc. 68-2, pg. 3; Doc. 71, pg. 13.) The parties agree that quality inspectors had to rely on their own working knowledge and expertise of the Project as well as industry standards during inspections. (Doc. 71, pg. 3; Doc. 73, pg. 3.)

After inspecting a portion of the Project, Plaintiffs would complete the appropriate portion of L-3's quality document known as the Quality Control Checklist ("QCC"), thereby indicating that the item had passed inspection. (Doc. 71, pg. 3; Doc. 73, pg. 3.) After Plaintiffs had inspected an approved an item, the item would be inspected and approved by the quality inspectors from Boeing and the federal government. (Doc. 71, pg. 3; Doc. 73, pg. 3.) If an item did not pass Plaintiffs' inspection, Plaintiffs would complete a Non-Compliance Report ("NCR") describing what was non-conforming and why. (Doc. 71, pg. 5; Doc. 73, pg. 4.) An NCR could trigger a change to the engineering plans for the Project. (Doc. 71, pg. 5; Doc. 73, pg. 4.) Accordingly, Plaintiffs' jobs

required them to present to Boeing what work they had approved or rejected and why. (Doc. 71, pg. 4; Doc. 73, pg. 3.)   Plaintiffs also attended some meetings at which Boeing presented items to government inspectors. (Doc. 71, pg. 4; Doc. 73, pg. 3.)

At all times during their employment, Plaintiffs were classified as "exempt" employees under L-3's Exempt/Non-Exempt Status Policy, which states that exempt employees are not compensated for hours worked in excess of 40 hours per week.  When they were hired by L-3, Plaintiffs believed they would be working around 50 hours per week. (Doc. 68-2, pg. 6; Doc. 71, pg. 16.)   Time records submitted to the Court indicate that Plaintiffs reported to L-3 work periods ranging from 40 to 86 hours per week. (Doc. 68-3, Ex. 6.)   Plaintiffs complained repeatedly to Jeff D'Heron about the long hours. (Doc. 68-2, pg. 7; Doc. 71, pg. 17.)   L-3 responded to the complaints by adjusting Plaintiffs' salaries. (Doc. 68-2, pg. 7; Doc. 71, pg. 17.)   From the beginning of the Project, L-3 had paid Plaintiffs a bi-weekly salary, which was not adjusted depending on the number of hours worked. (Doc. 68-2, pg. 7; Doc. 71, pg. 17.)   In February 2010, L-3 began paying Plaintiffs overtime pay in addition to their bi-weekly salary. (Doc. 68-2, pg. 7; Doc. 71, pg. 17.)   If Plaintiffs worked 50 hours or less in a work week, they received their bi-weekly salary.  For each hour over 50, they received overtime pay. (Doc. 68-2, pg. 7; Doc. 71, pg. 17.)  Plaintiffs did not receive overtime pay for hours over 60 in a work week. (Doc. 68-2, pgs. 7-8; Doc. 71, pg. 17.)

On May 4, 2011, Plaintiffs filed the instant action against Defendants, alleging a single claim: unlawful failure to pay overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219. (Doc. 1.)  Plaintiffs seek an award of compensatory and liquidated damages. (*Id*.)

## STANDARD OF REVIEW

In deciding a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). Summary judgment is appropriate if the pleadings and supporting documents "show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party moving for summary judgment initially must demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325.  The moving party merely needs to point out to the Court the absence of evidence supporting its opponent's claim; it does not need to disprove its opponent's claim.  *Id.*; *see also* Fed. R. Civ. P. 56(c).  If a moving party has made this showing, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  *See also Anderson*, 477 U.S. at 256; *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).  The non-moving party may not "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990).

## ANALYSIS

The FLSA is a remedial statute designed to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of workers." 29 U.S.C. § 202.  The FLSA sets a maximum number of hours employees may work per week.  *Id.* at § 207.  Unless an FLSA exemption applies, employees may be required to work more than 40 hours per week only if, for every hour worked over the maximum, the employer compensates the employee at a rate "not less than one and one-half times the regular rate at which he is employed." *Id.* at § 207(a)(1).  The overtime pay requirements of the Act do not apply to salaried employees who work in a "bona fide executive, administrative or professional capacity." *Id.* at § 213(a)(1).  Pursuant to the FLSA, the Secretary of the Department of Labor ("DOL") has issued regulations defining each exemption. *See* 29 C.F.R. §§ 541.200-541.215.  In a FLSA overtime-wage case, the question of how an employee

spends his or her workday is one of fact, while the question of whether his or her activities exclude him or her from the overtime-pay requirement is one of law. *See Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 391 (9th Cir. 2011) (citations omitted). The employer has the burden of showing the exemption applies to its employee. *Id.* FLSA exemptions are to be "narrowly construed against ... employers and are to be withheld except as to persons plainly and unmistakenly within their terms and spirit." *Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000) (internal quotation marks and citations omitted).

Plaintiff moves for partial summary judgment on three grounds: (1) Plaintiffs do not fall within the executive or administrative exemption; (2) the Fluctuating Work Week method ("FWW method") should not be retroactively applied to calculate overtime damages; and (3) Defendant's affirmative defenses fail as a matter of law. In its cross-motion for summary judgment, Defendant contends that: (1) Plaintiffs were properly classified as administratively exempt; (2) Plaintiffs qualify for the executive and combination exemptions; (3) any calculation of damages should be conducted pursuant to the FWW method; and (4) summary judgment on Defendant's affirmative defenses is improper. For the reasons stated herein, the Court will grant summary judgment in favor of Plaintiffs.

**1.     Plaintiffs do not fall within the administrative exemption**

Defendant bears the burden of proving the applicability of an FLSA exemption. Accordingly, Defendant can defeat Plaintiffs' Motion for Summary Judgment by demonstrating a material issue of fact exists with respect to the applicability of the administration exemption. Defendant can prevail on its motion for summary judgment by demonstrating that, on the undisputed facts, the exemption applies as a matter of law. In order for the administrative exemption to apply, Defendant must prove that: (1) Plaintiffs' primary duty included the exercise of discretion and independent judgment with respect to matters of significance; (2) Plaintiffs' primary duty was the performance of office or non-manual work related to the management or general business operations of the employer or the employer's customers; and (3) Plaintiffs were compensated on a

salary or fee basis at a rate of not less than $455 per week or $23,660 annually.  *See* 29 C.F.R. § 541.200(a).  Plaintiffs concede that they meet the salary requirement of the regulation.  The parties dispute whether Defendant has satisfied its burden with respect to the other two prongs of the definition.  The Court concludes that Defendant has failed to demonstrate the applicability of the exemption and Plaintiffs are entitled to summary judgment on this ground.

In FLSA cases, a court must first determine the employee's primary duty, and then determine whether that primary duty disqualifies the employee from FLSA's protections.  *See Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 827 (10th Cir. 2012).  The applicable regulations defined "discretion and independent judgment" as "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).  The term "matters of significance" refers to the level of importance or consequence of the work performed.  *Id.*  In determining whether an employee exercises discretion and independent judgment, courts look to numerous factors, including:

> Whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).  The regulations further provide that: "[o]rdinary inspection work generally does not meet the duties requirement for the administrative exemption.

Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been catalogued and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They have some leeway in the performance of their work but only within closely prescribed limits." 29 C.F.R. § 541.202(g).

In the present case, the parties agree that Plaintiffs' primary duty was to inspect construction work as it was completed on the Project in order to verify whether the work had been completed in "strict adherence to applicable specifications." (Doc. 68-2, pg. 3; Doc 71, pg. 12.)  As a matter of law, that duty did not include the exercise of discretion and independent judgment.  Plaintiffs performed ordinary inspection work of the type contemplated by 29 C.F.R. § 541.202(g) and therefore do not fall within the administrative exemption.

In an attempt to demonstrate that Plaintiffs' duties exceeded those of ordinary inspectors, Defendant alleges that Plaintiffs had autonomy with respect to initiating inspection, approving or denying items, revising inspection specifications and presenting approved items to Boeing.  Even when the facts are construed in the light most favorable to Defendant, however, Plaintiffs' work cannot fairly be described as evaluating possible courses of conduct and acting after the various possibilities have been considered, as contemplated by 29 C.F.R. § 541.202(a).  Plaintiffs did not have subjective autonomy with respect to initiating inspection or approving or denying inspected items.  Plaintiff Blotzer and Supervisor Doug Gordon each gave similar testimony in their depositions about the scope of Plaintiffs' inspection responsibility and inspection.  Construction and inspections were performed in a sequential manner as dictated by the Project's Buildbook. (Doc. 71-2, pgs. 16-17.)  Plaintiffs were notified by Operations Department employees (*ie.* employees responsible for construction) when an item was ready for inspection. (Docs. 71-1, pg. 7; 71-2, pg. 18.)  Nothing in the record supports Defendant's assertion that Plaintiffs initiated inspections at their discretion.  To the contrary, Doug Gordon specifically testified that Plaintiffs did not decide whether to complete a particular inspection. (Doc. 71-2, pg. 45.)

- 8 -

Defendant also overstates Plaintiffs' autonomy with respect to approving or denying items. It is undisputed that Plaintiffs' inspection required them to compare the construction work to the specifications set forth in national standards manuals and the company's internal Work Order Process. (Doc. 71, pg. 2; Doc. 73 pg. 2.) If work met Defendant's specifications, Plaintiffs noted a "pass" on Defendant's QCC; Plaintiffs' approval was then reviewed by Boeing and the government. (Doc. 71, pg. 3; Doc. 73 pg. 3.) Although Plaintiffs had the authority to reject work, they could only reject work on the basis that the work did not comply with Defendant's specifications.[3] (Doc. 71-2, pgs. 19-24; Doc. 71-3, pg. 13.) *See* 29 C.F.R. § 541.202(b) (authority to waive or deviate from established policies and procedures without prior approval is one factor to consider in evaluating independence and discretion). Thus, even as characterized by Defendant, Plaintiffs' work was primarily "specialized work … involving well-established techniques … which may have been catalogued and described in manuals." 29 C.F.R. § 541.202(g). The fact that, in order to conduct inspections, Plaintiffs were required to call upon their experience and use their best judgment does not elevate them beyond the role of an ordinary inspector.[4] The regulations specifically contemplate that inspectors may "rely on techniques and skills acquired by special training or experience" and exercise "some leeway in the performance of their work." 29 C.F.R. § 541.202(g).

---

[3] Furthermore, it appears that attempts by inspectors to independently reject Project specifications were not well-received. Plaintiff Blotzer described an incident in which he arguably attempted to exercise independent judgment during the presentation of his approvals to Boeing. After observing that an engineering blueprint called for three plumbing cleanouts and the operations department was only able to install two, Blotzer noted that applicable codes required only two and approached the Boeing inspector about whether installation of only two would be sufficient. (Doc. 73-1, pg. 18.) The Boeing inspector rejected Blotzer's suggestion and instructed him to follow the standard protocol of issuing an NCR and triggering revision of the engineering blueprint.

[4] Given Plaintiffs' lack of discretion in approving or rejecting items, the Court disagrees with Defendant's assertion that Plaintiffs are comparable to the inspectors in *Brock v. On Shore Quality Control Specialists, Inc.*, 1987 WL 31308 (W.D. Tex. 1987). The *Brock* inspectors had far more independence and leadership responsibility than Plaintiffs: "on numerous occasions, sometimes on a daily basis, the [*Brock*] inspectors deviated from prescribed standards" while "testing welders, making recommendations that employees of the contractors should be dismissed, shutting down jobs when unsafe conditions so merited, dealing with landowners and making daily decisions as to whether the contractor was in fact performing the contract in a suitable manner." *Id.* at *7.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant contends that Plaintiffs exercised discretion because they had the authority to redline changes onsite to specifications in the WOP and QCC documents and to close NCRs. In performing each of these tasks, however, Plaintiffs were still operating within "closely prescribed limits." 29 C.F.R. § 541.202(g). Plaintiff Lilly testified that he could redline a WOP only with the approval of his supervisor. (Doc. 71-1, pg. 74.) *See Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120, 1129 (9th Cir. 2002) (evidence that inspector was required to consult with supervisor for all but the smallest decisions supports finding that inspector did not fall within FLSA administrative exemption). Doug Gordon also described the WOP as "dictated by the customer and the job requirements," and stated that Plaintiffs did not decide what work was going to be performed or which criteria to use when applying the WOP during inspections. (Doc. 71-2, pgs. 44-45.) Although Plaintiffs had some input on WOPs and QCCs, that input was not one of their primary job duties and was infrequent.[5] (Doc. 71, pgs. 6-7; Doc. 73, pgs. 5-6.). *See Copas v. East Bay Municipal Utility Dist.,* 61 F.Supp.2d 1017, 1039 (N.D. Cal. 1999) (evidence that employee assisted with preparation of budget does not support a finding of administrative exemption where whatever time he contributed to that project did not constitute a major portion of his time on the job); *see also* 29 C.F.R. § 541.202(a) ("the term 'matters of significance' refers to the level of importance or consequence of the work performed."). In fact, it is undisputed that the bulk of Plaintiffs' time was spent performing inspection work and completing paperwork related to their inspections. (Doc.

---

[5] Defendant's argument that Plaintiffs exercised independent judgment and discretion because they had the authority to redline QCC's is not well-supported or persuasive. The role of a QCC in the construction process is unclear; Doug Gordon described it as a document that would provide inspectors with additional inspection protocols to follow at certain inspection points identified in the WOPs. (Doc. 71-2, pg. 36.) Both parties describe the QCC as a checklist used during inspection. (Doc. 71, pg. 3; Doc. 73, pg. 3.) Doug Gordon also testified that he prepared the QCCs with Jeff D'Heron and someone from the Operations Department. (Doc. 71-2, pg. 36.) The QCCs were then circulated among the inspectors, operations employees and engineers for input. (Doc. 71-2, pgs. 36-37.) Plaintiff Lilly testified that he was unaware of any QCCs being modified as a result of his review. (Doc. 71-1, pg. 77.) Doug Gordon testified that Plaintiffs had the authority to redline QCCs in the field if the QCC was incorrect due to a site-specific issue, but not if the proposed change would affect engineering plans. (Doc. 71-2, pgs. 40-45.) Doug Gordon was not able to articulate an example of a permissible redline to a QCC by an inspector. (Doc. 71-2, pg. 41.) Contrary to Defendant's characterization of Plaintiff Lilly's testimony, it is unclear from Lilly's deposition whether he redlined QCC's without supervisor approval. (Doc. 71, pg. 5; Doc. 71-1, pg. 101.)

68-2, pg. 3; Doc. 71, pg. 13.)  Plaintiffs could close out an NCR only after it was elevated to the engineering department, approved by Defendant's quality management team and Boeing's quality management and after Operations Department staff completed the work.[6]  (Doc. 71, pg. 5; Doc. 68-2, pg. 5; Doc. 71, pgs. 14-15.)  The record does not suggest that redlining a WOP/QCC or closing out an NCR gave Plaintiffs special "authority to waive or deviate from established policies and procedures without prior approval," 29 C.F.R. 541.202(b), or to determine the specifications that applied to construction tasks on the Project.

Similarly, the fact that Plaintiffs presented inspections to Boeing is not persuasive evidence that Plaintiffs exercise discretion and independent judgment.  The Court agrees with Plaintiffs' contention that interfacing with a customer does not elevate an employee's job duties to a management or operations level.  (Doc. 72, pg. 3.)  It is undisputed that upon approving an inspected item, Plaintiffs would notify a Boeing inspector that the item had been approved by L-3.  Doug Gordon testified that Defendant's QC inspectors present to the Boeing inspectors "here's what we've done … I've accepted it … here's the reasons why." (Doc. 71-2, 26.)  If the Boeing inspector did not agree, Doug Gordon, Jeff D'Heron and/or L-3 engineers would manage the corrective action and the Operations Department would implement it.  (Doc. 71-2, pgs. 26-27.)  Plaintiffs' involvement was basically limited to reporting.  Plaintiffs had no authority to formulate or implement corrective action at the management or operations level.

Defendant's argument in favor of application of the administrative exemption relies primarily on *O'Dell v. Alyeska Pipeline Serv. Co.*, 856 F.2d 1452 (9th Cir.1988); that reliance is misplaced.  First, contrary to Defendant's assertion, *O'Dell* is not the "leading decision with respect to assessing the exempt status of inspectors." (Doc. 70, pg. 13.)  *O'Dell* is a 24 year-old case that has been discounted as precedent because it relies on the erroneous premise that FLSA regulations are simply guides that do not bind

---

[6] The record does not support Defendant's claim that Plaintiff Lilly wrote an NCR on work that was in full compliance with specifications because he believed there was a better way to do it.  (Doc. 71, pg. 6.)  That question was asked but not answered during Lilly's deposition. (Doc. 71-1, pg. 75.)

the court or limit its discretion.  *See Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120 (9th Cir. 2002) (noting that the *O'Dell* approach to regulatory construction has been rejected by both the United States Supreme Court and the Ninth Circuit).  Furthermore, *O'Dell* is factually distinguishable from the case at bar.  The inspector in *O'Dell* exercised far more authority and discretion than Plaintiffs.  Whereas Plaintiffs are instructed to reject construction work that does not comply with specification, the inspector in *O'Dell* had the authority to "attempt to handle the discrepancy on site by negotiation with the project supervisor."  *Id*. at 1453.   The O'Dell inspector could make recommendations for waivers of specifications, review and override the decisions of quality control inspectors employed by contractors, develop guidelines for inspection procedures and offer assistance to contractors in interpreting codes. *Id.* at 1453-54.  Acting as both "field inspector and a quality control inspector," the inspector in *O'Dell* was higher up the chain of authority than Plaintiffs and operated with more autonomy.  Unlike Plaintiffs, he had the authority to compare, evaluate and choose between various courses of conduct as contemplated by 29 C.F.R. § 541.202(a).   For those reasons, the Court does not find *O'Dell* to be binding or persuasive.

Defendant has failed to meet its burden of proof with respect to the regulations' criteria for the administrative exemption.  Defendant's characterization of Plaintiffs not as ordinary inspectors but as autonomous "members of the quality team" defies the FLSA's instruction that the administrative exemption "be withheld except as to persons plainly and unmistakenly within their terms and spirit."  *Klem*, 208 F.3d at 1089.  Because the Court concludes that Plaintiffs' primary duties did not include the exercise of discretion and independent judgment, the Court need not consider the second prong of 29 C.F.R. § 541.200(a), *ie.* whether Plaintiffs' primarily performed office or non-manual work related to the management or general business operations of the employer or the employer's customers.  Accordingly, Defendant is not entitled to summary judgment on the issue of whether the administrative exemption applies.  Moreover, the Court concludes that there is no genuine issue of material fact with respect to the administrative exemption such that Defendant should be permitted to argue for application of the

- 12 -

exemption at trial.   Therefore the Court will grant summary judgment in favor of Plaintiffs on this issue.

### 2.    Plaintiffs do not fall within the executive exemption

Defendant bears the burden of proving the applicability of the executive exemption.  Accordingly, Defendant can defeat Plaintiffs' motion for summary judgment by demonstrating a material issue of fact exists with respect to the applicability of the exemption.  Defendant can prevail on its motion for summary judgment by demonstrating that, on the undisputed facts, the exemption applies as a matter of law.  In order for the executive exemption to apply, Defendant must prove that: (1) Plaintiffs were compensated on a salary basis at a rate of not less than $455 per week; (2) Plaintiffs' primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) Plaintiffs customarily and regularly directed the work of two or more other employees; and (4) Plaintiffs had the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight. *See* 29 CFR § 541.100(a).  Plaintiffs concede that they meet the salary requirement of the regulation.  The parties dispute whether Defendant has satisfied its burden with respect to the other three prongs of the definition. The Court concludes that Defendant has failed to demonstrate the applicability of the exemption and that Plaintiffs are entitled to summary judgment on this ground.

Defendant identifies only one example in support of its claim that, as part of their job duties, Plaintiffs made recommendations as to hiring and firing which were given particular weight: Plaintiff Lilly recommended Plaintiff Blotzer for an inspector position and, based upon that recommendation, Doug Gordon hired Plaintiff Blotzer.[7]  (Doc. 68-2,

---

[7] The Court rejects as factually unsupported Defendant's argument that Plaintiff Blotzer recommended a change of status for an operations employee who performed "shoddy" work. (Doc. 70, pg. 19.)  The entirety of Blotzer's testimony on that issue is that during an inspection he issued an NCR because an operations employee had spliced wire and it was not in compliance with code.  (Doc. 71-1, pg. 31.)  Blotzer described the work as "shoddy."  (*Id*.)  Other than issuing an NCR – which does not appear to have any bearing on employee discipline issues – Blotzer took no other action and there is no evidence that the NCR triggered any employee

pg. 6; Doc. 71, pg. 15.)   As a matter of law, this is insufficient evidence to categorize Plaintiffs as executively exempt, especially given that FLSA exemptions are to be narrowly construed against employers and withheld except as to persons plainly and unmistakably within the terms of the regulation.  *See Klem*, 208 F.3d at 1089.  29 C.F.R. § 541.105 provides:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker.

The only evidence in the record related to Plaintiff Lilly's recommendation of Plaintiff Blotzer is Doug Gordon's testimony that "obviously they knew one another prior to coming there.   In fact, as I recall, I hired Fred, and he recommended Tim.   I interviewed Tim and found that he was everything that Fred had represented and hired him as well."  (Doc. 71-2, pgs. 14-15.) There is no evidence in the record to suggest that it was part of Plaintiff Lilly's job duties to suggest or recommend people for the inspector position.    There is no evidence that either Plaintiff made such suggestions or recommendations with frequency – or even more than once.  Furthermore, Plaintiff Lilly did not direct Plaintiff Blotzer's work.  In short, Plaintiff Lilly's recommendation appears to have been nothing more than "an occasional suggestion with regard to the change in status of a co-worker." 29 C.F.R. § 541.105.  As such, it is not grounds for categorizing Plaintiffs as executively exempt.  *See Rock v. Sunbelt Cranes, Const. & Hauling, Inc.*, 678 F.Supp.2d 1264, 1269-70 (M.D. Fla. 2009) (denying summary judgment on application of executive exemption where employee made occasional suggestions regarding employee promotions and infrequently exercised his authority to hire and fire).

discipline.

1
2
3
4
5
6
7
8
9
10
11

Defendant has failed to meet its burden of proof with respect to the regulations' criteria for the executive exemption. Because the Court concludes that Defendant has failed to demonstrate that Plaintiffs' suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight, the Court need not consider whether Plaintiffs' primary duty was management of the enterprise or whether Plaintiffs customarily and regularly directed the work of two or more other employees. Accordingly, Defendant is not entitled to summary judgment on the issue of whether the executive exemption applies. Moreover, the Court concludes that there is no genuine issue of material fact with respect to the executive exemption such that Defendants should be permitted to argue for application of the exemption at trial. Therefore the Court will grant summary judgment in favor of Plaintiffs on this issue.

12

**3.     The FWW method should not be used to calculate overtime damages**

13
14
15
16
17
18
19
20
21
22

Because the Court concludes that Defendant misclassified Plaintiffs as exempt, the Court also concludes Defendant violated the FLSA and Plaintiffs are entitled to an award of damages. Both parties seek summary judgment on the issue of whether the "fluctuating work week method" ("FWW") set forth in 29 C.F.R. § 778.114, applies to Plaintiffs' damages calculation. Under this method, non-exempt employees who are paid on a salary basis and have hours that fluctuate week to week are entitled to overtime calculated as a fixed salary to cover all hours worked plus one-half the regular rate of pay for all hours over 40. Defendant contends that the method is appropriate, while Plaintiffs contend it should not be applied.[8]  The Ninth Circuit has not directly addressed the

23
24
25
26
27
28

[8] Neither party briefed the issue of how damages should be calculated in the event the FWW method is not applied. For the reasons stated in *Ransom v. M. Patel Enters., Inc.,* 825 F.Supp.2d 799, 809 (W.D. Tex. 2011), the Court concludes that Plaintiffs' "regular rate" within the meaning of 29 U.S.C. § 207(a)(1) is determined by dividing their weekly salary by the number of hours per week the salary was intended to compensate, and that this is a question of fact. Defendants are entitled to rebut the presumption that Plaintiffs' fixed salary was meant to compensate them solely for 40 hours. *Id.* In fact, given that the parties did not dispute in the context of these motions that Plaintiffs believed they would work 50 hours per week, the parties may be able to stipulate that Plaintiffs' regular rate should be calculated as their weekly salary divided by 50. Plaintiffs are entitled to 150% of that amount for each hour worked over 40; it is undisputed that some portion of that overtime pay was paid to Plaintiffs beginning in February,

question of whether the FWW method may be used retroactively to compensate employees who have been misclassified as exempt.   Other federal courts are divided on the issue.  *See In re Texas EZPawn Fair Labor Standards Act Litigation*, 633 F.Supp.2d 395, 401 n.4 (W.D. Tex. 2008) (collecting cases).   The Court acknowledges that several Circuit courts have applied the FWW method in misclassification cases. *See, e.g., Valerio v. Putnam Associates Inc*. 173 F.3d 35, 39 (1ˢᵗ Cir. 1999); *Desmond v. PNGI Charles Town Gaming, L.L.C..,* 630 F.3d 351, 357 (4ᵗʰ Cir. 2011); *Blackmon v. Brookshire Grocery Co.,* 835 F.2d 1135 (5ᵗʰ Cir. 1988); *Urnikis–Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 681 (7th Cir. 2010); and *Clements v. Serco, Inc.,* 530 F.3d 1224, 1230-31 (10ᵗʰ Cir. 2008).  However, this Court is persuaded by the reasoning of those courts that have concluded the FWW method should not be applied in a misclassification case in light of the FLSA's remedial purpose.[9]

Ordinarily, the FLSA mandates that overtime be compensated at 150% of the "regular" hourly rate.  *See* 29 U.S.C. § 207.  Four years after the FLSA was adopted, the United States Supreme Court decided *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942) ("*Missel*").  *Missel* held that an employer and employee could legally agree, in certain circumstances, to a compensation arrangement where the employee would be paid a flat weekly rate for fluctuating hours without violating the FLSA, provided that the agreement contained a provision for overtime pay and the wage was sufficient to satisfy minimum wage requirements and offer a premium of at least "fifty per cent for the hours actually worked over the statutory maximum."  *Id*. at 581.  In 1968, the Department of Labor (DOL) promulgated 29 C.F.R. § 778.114, an interpretive rule intended to codify the Supreme Court's decision in *Missel*.  *See Russell v. Wells Fargo and Co.*, 672

---

2010.

[9] The Court is not swayed by the Department of Labor's January 14, 2009 Opinion letter, which concludes that the FWW method can be used to compute overtime compensation retroactively in a misclassification scenario. *See* Wage & Hour Div., U.S. Dep't of Labor, Retroactive Payment of Overtime and the Fluctuating Workweek Method of Payment, Opinion Letter (FLSA2009-3) (2009).  The Opinion letter relies on *Clements v. Serco, Inc*., 530 F.3d 1224 (10th Cir.2008), and *Valerio v. Putnam Associates, Inc*., 173 F.3d 35 (1st Cir.1999), which, for the reasons stated herein, the Court declines to follow.

F.Supp.2d 1008, 1011 (N.D. Cal. 2009).  The section provides, in pertinent part:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

The employer must satisfy five conditions in order to take advantage of the FWW calculation: (1) the employee's hours must fluctuate from week to week, (2) the employee must receive a fixed salary, (3) the salary must meet the minimum wage standards, (4) the employee and the employer must have a clear mutual understanding that the salary (not including overtime premiums) is fixed regardless of the number of hours the employee works, and (5) the employee must receive overtime compensation for hours worked in excess of forty hours, not less than one-half the rate of pay. *Brown v. Nipper Auto Parts and Supplies, Inc.,* 2009 WL 1437836, *6 (W.D. Va. 2009) (citing *Flood v. New Hanover County*, 125 F.3d 249, 252 (4th Cir.1997) and 29 C.F.R. § 778.114(a)).

The FWW method set forth in 29 C.F.R. § 778.114 is not intended to apply retroactively in a misclassification case. *See Urnikis-Negro,* 616 F.3d at 666 (stating that 29 C.F.R. § 778.114 is not a remedial measure that specifies how damages are to be calculated when a court finds that an employer has breached its statutory obligations).   It was drafted by the Department of Labor as "forward-looking" and only describes how employers and employees should structure an agreement for future compensation. *Id.* at 677. Moreover, because the regulation was adopted without formal rule-making, it is entitled to less deference. *See Hasan v. GPM Investments, LLC*, 2012 WL 3725693, *2

(D.Conn. 2012) (citing *Christensen v. Harris Co*., 529 U.S. 576 (2000)).   The Court concludes that the FWW should not be applied in the present case because: (1) it is contrary to the rationale of the FLSA to apply the FWW method in misclassification cases; (2) application of the FWW in misclassification cases runs counter to the intent of the FLSA; and (3) even if the FWW method were applied, Defendant has failed to prove the elements of the FWW method are present in this case.

Application of the FWW method in a misclassification case is contrary to FLSA's rationale. The FWW method requires proof of a "clear mutual understanding" that: (1) the fixed salary is compensation for the hours worked each work week, whatever their number; and (2) overtime pay will be provided contemporaneously such that it fluctuates depending on hours worked per week.  *See* 29 C.F.R. §§ 778.114(a) & (c).  In a misclassification case, at least one of the parties initiated employment with the belief that the employee was exempt from the FLSA, paid on a salary basis, and therefore not entitled to overtime.  When an employee is erroneously classified as exempt and illegally being deprived of overtime pay, neither the fourth nor fifth legal prerequisites for use of the FWW method is satisfied.  The parties do not have a "clear, mutual understanding" that a fixed salary will be paid for "fluctuating hours, apart from overtime premiums" because the parties have not contemplated overtime pay.[10]   In addition, because the employees were erroneously classified as exempt, overtime compensation was not provided contemporaneously.  *See Russell v. Wells Fargo and Co.,* 672 F.Supp.2d 1008 (N.D. Cal. 2009); *Hasan*, 2012 WL 3725693 at * 4 (collecting cases which hold that, in a misclassification case, the parties never agreed to an essential term of a fluctuating work week arrangement, *ie.* that overtime would be paid at different rates depending on the number of hours worked per week).  As the court stated in *Ransom v. M. Patel Enters., Inc*., 825 F.Supp.2d 799, 810 n.11 (W.D. Tex. 2011):

---

[10] The parties cannot mutually agree that the employee will be paid a flat weekly rate for fluctuating hours, including those hours worked in excess of forty, without overtime pay.  Such an agreement would be illegal: employees cannot agree to waive their right to overtime pay. *See Russell v. Wells Fargo and Co*., 672 F.Supp.2d 1008 (N.D. Cal. 2009).

> The significance of the employee's lack of knowledge of non-exempt status cannot be overstated. The fundamental assumption underpinning the FWW is that it is fair to use it to calculate overtime pay because the employee consented to the payment scheme. But in the context of an FLSA misclassification suit when consent is inferred from the employee's conduct, that conduct will always, by definition, have been based on the false assumption that he was not entitled to overtime compensation. The job will have been advertised as a salaried position. The employee, if he raised the issue, will have been told that the salary is all he will receive, regardless of how many hours he works. That is the very nature of a salaried, exempt position. When it turns out that the employer is wrong, and it is learned that the FLSA required the employer to pay the employee an overtime premium, the notion that the employee's conduct before he knew this is evidence that the employee somehow consented to a calculation method for the overtime pay that no one even knew was due, is perverse. If the FWW requires consent in some fashion, the employee's actions before he knew he was due overtime pay just cannot logically be the basis of that consent.

Furthermore, 29 C.F.R. § 778.114(c) provides that the FWW method cannot be used "where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for non-overtime hours." In a misclassification case, because employees have not been paid overtime premiums, they are compensated for those hours worked more than forty at a rate not greater than the regular rate. *Russell*, 672 F.Supp.2d at 1014. Thus, attempting to retroactively apply the FWW method to a miscalculation case is akin to "the old 'square peg in a round hole' problem [because it requires] apply[ing] § 778.114 to a situation it was not intended to address." *EZPawn*, 633 F.Supp.2d at 402.

"In making its decision here, the Court is 'mindful of the directive that the [FLSA] is to be liberally construed to apply to the furthest reaches consistent with Congressional direction.'" *Russell*, 672 F.Supp.2d at 1014 (*citing Klem*, 208 F.3d at 1089). Application of the FWW in a misclassification case gives rise to a "perverse incentive" for employers, because the employee's hourly "regular rate" decreases with each additional hour worked. In fact, the difference between the FWW method and the traditional time-and-a-half method can result in an employee being paid seventy-one percent less for overtime

over a given year, and under the FWW method, the effective overtime hourly rate of an employee working sixty-one hours or more is less than the non-overtime hourly rate of an employee who worked no more than forty hours per week.  *See Russell*, 672 F.Supp.2d at 1012; *see also Hasan,* 2012 WL 3725693 at *2 (calculating the pay difference for a misclassified employer under both methods). This result is contrary to the FLSA's purpose: encouraging employers to spread employment among more workers, rather than employing fewer workers who are then required to work longer hours.  *See Robertson v. Alaska Juneau Gold Min. Co.*, 157 F.2d 876, 879 (9th Cir. 1946).

Finally, even if the Court concluded that the FWW method does apply in some miscalculation cases, it would not apply in the present case because Defendant has failed to demonstrate a "fluctuating" work week or a "clear mutual understanding" of straight pay and a contemporaneous overtime arrangement as required by the regulation.  The FWW was intended to apply to "fluctuating" work schedules, *ie.* schedules in which an employee endures long hours some weeks but enjoys the benefit of short hours in other weeks, all at the same rate of pay.  *See Hasan*, 2012 WL 3725693 at *4.  In the present case, it is undisputed that Plaintiffs consistently worked more than 40 hours per week. Thus, Plaintiffs' "variance, between weeks with a moderate amount of overtime hours, and weeks where a majority of hours worked exceeded the 40 hour threshold, is not the same as the up and down fluctuation contemplated by the DOL and by the Court in *Missel*." *Id.*   In addition, by its plain terms, the FWW method applies only when the employee clearly understands that he will receive straight-time pay for all hours worked and extra compensation of at least half his regular rate of pay, in addition to the fixed salary, for overtime hours during the weeks when he works overtime.  *Hunter v. Sprint Corp.,* 453 F.Supp.2d 44, 59 (D.D.C. 2006); *Russell*, 672 F.Supp.2d at 1013-14.  No such clear, mutual understanding is present in this case.  Defendant contends that Plaintiffs agreed to work for a set salary regardless of whether they worked "35 hours or 55 hours." (Doc. 74, pg. 13.)  Defendant misquotes Plaintiffs' testimony regarding the number of hours they anticipated working.  Although Defendant describes the Plaintiffs' testimony regarding their salary as their "sole source of income regardless of whether they worked

35 or 55 hours," neither Plaintiff testified to any expectation of ever working less than 40 hours. (Doc. 71, pg. 10; Doc. 71-1, pgs. 35 & 52.)   The undisputed evidence is that Plaintiffs expected to work 50 hours a week.  Furthermore, even if Defendant could prove that Plaintiffs and Defendant had a clear, mutual understanding that Plaintiffs would work 50 hours a week without overtime pay, such an arrangement amounts to an agreement "not to receive their FLSA entitlement to overtime pay. This would be illegal. Employees cannot agree to waive their right to overtime pay." *Russell,* 672 F.Supp.2d at 1014.  The parties' lack of "mutual understanding" regarding Plaintiffs' salary is further supported by the fact that Plaintiffs, upon realizing that they were being required to work far more than 50 hours per week, complained about their hours and were eventually paid some overtime.

In sum, the Court agrees with its sister district court in Northern California which held that "If Defendants' position were adopted, an employer, after being held liable for FLSA violations, would be able unilaterally to choose to pay employees their unpaid overtime premium under the more employer-friendly of the two calculation methods. Given the remedial purpose of the FLSA, it would be incongruous to allow employees, who have been illegally deprived of overtime pay, to be shortchanged further by an employer who opts for the discount accommodation intended for a different situation." *Russell*, 672 F.Supp.2d at 1014.  Accordingly, the Court concludes that the FWW method to damages calculation is not applicable in the instant case.

**4.   Plaintiffs are entitled to summary judgment on Defendant's affirmative defenses**

  **a.   Several affirmative defenses are no longer at issue**

The scope of Plaintiffs' argument regarding Defendant's affirmative defenses narrowed during the course of briefing on the cross-motions for summary judgment. Plaintiffs initially moved for summary judgment on Defendant's affirmative defenses B, K, G, H, I and J on the ground that those defenses were not applicable in FLSA actions to recover overtime compensation.  (Doc. 68, pg. 23.)  Defendant subsequently offered to withdraw those affirmative defenses.  (Doc. 70, pgs. 29-30; Doc. 74, pg. 14.)    Thus,

affirmative defenses B, K, G, H, I and J are no longer at issue and Plaintiffs' Motion for Summary Judgment is moot as to those defenses.[11]

Plaintiffs also moved for summary judgment on affirmative defenses A, D and F, which allege that Plaintiffs' claims are barred because Plaintiffs were exempt from the FLSA. As stated in sections 1 & 2 of this Order, Plaintiffs are entitled to summary judgment on Defendant's exemption claims and therefore the Court need not consider other grounds for summary judgment on these affirmative defenses.

### b. Plaintiffs are entitled to summary judgment on Defendant's "good faith" defenses

Finally, Plaintiffs seek summary judgment on affirmative defenses C and E, in which Defendant asserts that Plaintiffs' claims are barred by Sections 10 and 11 of the Portal-to-Portal Act, 29 U.S.C. §§ 259-260, because Defendant's classification of Plaintiffs as exempt was made in good faith. Plaintiffs do not dispute the potential applicability of these provisions, but contend that Defendant failed to identify any supporting material facts or persons with relevant knowledge regarding those affirmative defenses during discovery or present evidence in the record at the summary judgment stage to support Defendant's claim that it acted in good faith when it classified Plaintiffs as exempt. The Court agrees.

The FLSA provides partial and whole "escape hatches" from liability in certain instances in which an employer's misclassification of an employee is made in good faith. One of those escape hatches is Section 11 of the Portal-to-Portal Act, 29 U.S.C. § 260, which gives the Court the discretion not to award liquidated damages if certain conditions are met. Defendant asserts a Section 11 defense in affirmative defense E. Similarly, Section 10 of the Portal-to-Portal Act provides employers with a complete defense against overtime damages in certain situations. Defendant asserts a Section 10 defense in affirmative defense C. The Court considers each of these affirmative defenses in turn.

### i. Defendant has failed to meet its burden of proof with respect to

---

[11] In addition, Defendant does not intend to pursue affirmative defenses L and M. (Doc. 70, pg. 29; Doc. 74, pg. 14.)

### affirmative defense E

Plaintiffs are entitled to summary judgment on affirmative defense E, which asserts a "good faith" defense pursuant to Section 11 of the Portal-to-Portal Act, 29 U.S.C. § 260.  Section 216 of the FLSA mandates that an employer who fails to pay overtime as required by the FLSA is liable to the employee in the amount of their unpaid overtime compensation and an additional equal amount as liquidated damages.  "Double damages are the norm, single damages the exception...." *Walton v. United Consumers Club, Inc*., 786 F.2d 303, 310 (7th Cir. 1986).  Thus, liquidated damages are mandatory unless the employer can prove compliance with Section 11 of the Portal-to-Portal Act, which states:

> If the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.  Section 11 requires proof that the employer acted both in subjective good faith and with objectively reasonable grounds to believe that it was not in violation of the FLSA.  *See E.E.O.C. v. First Citizens Bank of Billings*, 758 F.2d 397, 403 (9th Cir. 1985).

An employer's burden of proof with respect to Section 11 is "plain and substantial," *Marshall v. Brunner*, 668 F.2d 748, 752 (3rd Cir. 1982), and "a difficult one to meet." *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir.1987).  In order to meet the subjective test, the employer must come forward with evidence of its actual reliance on a person or entity with knowledge of the FLSA regulations, including its attorney or the Department of Labor.  *See Elwell v. University Hospitals Home Care Services,* 276 F.3d 832, 840-41 (6th Cir. 2002); *see also Martin v. Cooper Elec. Supply Co*., 940 F.2d 896, 908 (3rd Cir. 1991) (to carry his burden, a defendant employer must show that he took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its

provisions).   The Court must then consider whether that reliance was objectively reasonable.   An employer may not rely on ignorance alone in meeting the objective test. *See Barcellona v. Tiffany English Pub*, 597 F.2d 464, 468-69 (5th Cir. 1979).   In addition, in lieu of any affirmative attempt by an employer to determine the legality of its wage payment practices, the employer's adherence to customary and widespread industry practices that violate the Act's overtime pay provisions is not evidence of an objectively reasonable good faith violation.   *Martin*, 940 F.2d at 910.   Finally, even where an exemption appears legally uncertain, the misclassification cannot be deemed objectively reasonable unless it "pervade[s] and markedly influence[s] the employer's belief." *Id.*

Given the exceptionally high burden of proof placed on employers attempting to assert a Section 11 affirmative defense, the Court concludes that Plaintiffs are entitled to summary judgment on Defendant's affirmative defense E.   During discovery, Plaintiffs served Defendant with an interrogatory asking Defendant to identify all material facts supporting affirmative defense E as well as any individual with personal knowledge regarding that affirmative defense.  (Doc. 68-2, Ex. 9, pg. 10.)  Defendant's response to the interrogatory stated several objections and asserted that it would supplement the response after the close of discovery.  (*Id.*)  It does not appear that any supplement was provided.[12]  Now that Plaintiffs have put Defendant to its proof with the pending Motion for Summary Judgment, Defendant contends that its decision to categorize Plaintiffs as exempt is supported by "a sufficient body of case law and supporting regulations" (Doc. 70, pg. 28), as well as offer letters stating Plaintiffs' positions were exempt and the disclosure of three Human Resource professionals.  (Doc. 74, pg. 15.)  Defendant points to its Initial Disclosure Statement, in which it listed Beth Skoletsky, Evelyn Finely and Michael Francisco – all employed in L-3's Human Resources Department – as "individuals likely to have discoverable information that Defendant may use to support its defenses." (Doc. 74-1, pgs. 2-3.) The Initial Disclosure Statement alleges that these 3

---

[12] Because the Court concludes that Defendant has failed to meet its burden of proof with respect to affirmative defenses C and E, it need not consider Plaintiffs' claim that Defendant failed to timely disclose evidence in support of those affirmative defenses and should not be permitted to use that evidence at trial.

individuals "may have information relating to Plaintiffs' claims that L-3 failed to pay them overtime wages in violation of [FLSA], the amounts L-3 actually paid to Plaintiffs and its basis for doing so . . . and other facts and issues related to this lawsuit." (*Id.*)

At best, the case law, documents and witness disclosures highlighted by Defendant could take shape at trial in the form of testimony from Beth Skoletsky, Evelyn Finely and/or Michael Francisco that they were familiar with FLSA regulations and case law and subjectively believed Plaintiffs could be classified as exempt, or that they relied on the advice of someone familiar with the FLSA (and applicable case law and regulations) in classifying Plaintiffs.  These human resource department employees would also need to testify that they did more than comply with industry-wide practices.  However, if Defendant has access to that testimony, it needed to bring it forward in the context of these cross-motions.  Plaintiffs' Motion for Summary Judgment points out the absence of evidence supporting affirmative defense E.  *Celotex*, 477 U.S. at 325.  The burden is therefore on Defendant to set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  It is not enough for Defendant to point to case law, documents and witness disclosures in a suggestion of an inference that the requisite "specific facts" exist.  *See Martin,* 940 F.2d at 908 (if the employer fails to come forward with plain and substantial evidence to satisfy the good faith and reasonableness requirements, the district court is without discretion to deny liquidated damages). Accordingly, the Court concludes that Plaintiffs are entitled to summary judgment as to Defendant's affirmative defense E.

### ii.   Defendant has failed to meet its burden of proof with respect to affirmative defense C

For similar reasons, the Court will grant summary judgment in favor of Plaintiffs as to Defendant's affirmative defense C, which asserts a defense under Section 10 of the Portal-to-Portal Act.  Section 10 provides that an employer is not liable for violation of the FLSA if "he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation" of the Wage and Hour Division of the Department of

Labor.  29 U.S.C. § 259.  Like Section 11, Section 10 of the Portal-to-Portal Act places a high burden of proof on the employer.  The employer must prove actual reliance on a specific administrative ruling or interpretation.  *See* 29 C.F.R. § 790.16(a).  The administrative interpretation relied upon must provide a clear answer to the particular situation in order for the employer to rely on it.  *See Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923 (11th Cir. 1987).  Finally, the employer must demonstrate that his good faith reliance was objectively reasonable.  *See Frank v. McQuigg*, 950 F.2d 590, 598 (9th Cir. 1991).

As was the case with affirmative defense E, Plaintiffs served Defendant with an interrogatory asking Defendant to identify all material facts supporting affirmative defense C as well as any individual with personal knowledge regarding that affirmative defense.  (Doc. 68-2, Ex. 9, pg. 9.)  Defendant's response to the interrogatory stated several objections and asserted that it would supplement the response after the close of discovery.  (*Id.*)  It does not appear that any supplement was provided.  At the summary judgment stage, Defendant has not provided the Court with specific citation to any portion of the record regarding this issue.  In fact, Defendant's response brief was essentially silent on the issue of affirmative defense C, prompting Plaintiffs to conclude in their Response/Reply that Defendant had abandoned the affirmative defense.  (Doc. 72, pg. 12.)  Defendant then clarified in its Response/Reply that it had not abandoned the defense and that its Motion contained "ample support (including the Rule 408 communication dated December 12, 2011, attached to Plaintiffs' Response) for this defense."  (Doc. 74, pg. 15.)[13]

Even if the Court were to construe Defendant's argument as a claim that it classified Plaintiffs as exempt based on its reasonable reliance on the authorities cited in its Motion, Defendant has nonetheless failed to meet its burden of proof with respect to affirmative defense C.  The record is devoid of any testimony that anyone within L-3's offices was actually familiar with and acted in reliance on that authority.  Defendant's

---

[13] The December 12, 2011 letter was not attached to any of Defendant's filings. Plaintiffs provided it as an attachment to their Response/Reply.  (Doc. 72-1, pgs. 6-7.)

Motion also fails to cite to a DOL regulation, order, ruling, approval, or interpretation that is specific to Defendant's situation.  To the contrary, the only regulations cited by Defendant are the regulations related to administrative and executive exemptions generally; the administrative exemption specifically excludes "ordinary inspection work."[14]  29 C.F.R. § 541.202(g).  In sum, Defendant has failed to meet its burden of proof with respect to affirmative defense C, and Plaintiffs are entitled to summary judgment on that affirmative defense.

## CONCLUSION

For the foregoing reasons, IT IS ORDERED THAT:

1.  Plaintiffs' Motion for Partial Summary Judgment filed on May 25, 2012 (Doc. 68) is GRANTED;

2.  Defendant's cross-Motion for Summary Judgment filed on June 28, 2012  (Doc. 70) is DENIED;

3.  Within 30 days of the date this Order is filed, the parties shall submit a Joint Proposed Pretrial Order.  The Court refers the parties to its October 18, 2011 Scheduling Order (Doc. 19) for further instructions.

Dated this 5th day of December, 2012.

Jennifer G. Zipps
United States District Judge

---

[14] To the extent Defendant's Motion cites to applicable case law construing the FLSA, Defendant has not cited to, and the Court is unaware of, any authority suggesting that case law is a "regulation, order, ruling, approval, or interpretation" by the DOL within the meaning of 29 U.S.C. § 259.